**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


KYLE B. MULL and
TAMSEN BALZANO-MULL,

                Plaintiffs,

v.                                CIVIL ACTION NO.      5:17-CV-94
                                                                   (JOHNSTON)

JEFFREY L. GRIFFITH
and CITY OF WHEELING,

                Defendants.


**MEMORANDUM OPINION AND ORDER**


Before the Court is Defendants' Jeffrey L. Griffith ("Griffith") and the City of Wheeling

("Wheeling") (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 68.) For

the reasons discussed herein, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### I.    *BACKGROUND*

Plaintiff Kyle Mull ("Mull") is a former police officer with the rank of corporal for the City

of Wheeling. (ECF No. 38 at 1 ¶ 5.) On June 22, 2016, Mull was working a shift at the police

department when Griffith, a fellow officer for Wheeling, arrived on duty as the incoming

supervisor. (*Id.*) Griffith was discussing an incident that occurred when he was accompanying

his mother-in-law to inspect her rental property earlier that day. (*Id.* at 2 ¶¶ 6, 7.) The inspection

resulted in a disturbance that required assistance from law enforcement. (*Id.* ¶ 6.) Mull

expressed disapproval of the fact that the t-shirt Griffith was wearing at the time of the incident

bore the name of the Wheeling Police Department. (*Id.* ¶ 7.) Griffith ordered him to leave the

office, (*id.* ¶ 10), and a physical altercation arose between Griffith and Mull, (*id.* ¶¶ 7, 8). Mull then returned his equipment and left the Department. (*Id.* at 3 ¶ 11.)

Mull alleges to have suffered physical and mental injuries as a result of the altercation. (*Id.* at 5 ¶ 26.) He filed a workers' compensation claim for his injuries and was awarded two percent permanent partial disability. (*Id.* at 9 ¶¶ 63, 66, 13 ¶ 88.) Mull also filed a criminal complaint against Griffith, but no charges were ultimately pursued by government officials. (*Id.* at 11 ¶ 78, 12 ¶¶ 82, 83.) In addition, he reported the incident to his supervisor and the Department subsequently conducted an internal investigation and issued Griffith a verbal reprimand. (*Id.* at 8 ¶ 52, 12 ¶ 84.) Griffith later retired. (*Id.* ¶ 85.)

Meanwhile, Mull continued to suffer from side effects from the assault and received a doctor's excuse recommending 48 hours of excused leave. (*Id.* at 8 ¶¶ 53, 55.) After taking several sick days, Mull changed the doctor's excuse to provide for five days of excused leave rather than 48 hours. (*Id.* at 7 ¶¶ 47, 49, 8 ¶¶ 58, 59.) Several months later, Wheeling's chief of police filed an internal complaint against Mull for submitting the forged doctor's excuse. (*Id.* at 11 ¶ 79.) He was suspended with pay for a brief period, and on April 4, 2017, Mull was terminated. (*Id.* at 13 ¶¶ 89, 90.)

Mull and his wife, Tamsen Balzano-Mull, bring eleven causes of action arising from these events against Defendants. (ECF Nos. 1, 38.) The Amended Complaint asserts three 42 U.S.C. § 1983 claims for excessive force in violation of the Fourth and Fourteenth Amendments (Count I); retaliation in violation of the First Amendment freedom of speech (Count II); and cruel and unusual punishment in violation of the Eighth Amendment (Count III). (ECF No. 38.) The Amended Complaint also asserts the following state law claims: assault and battery (Count IV);

tort of outrage (Count V); negligence (Count VI); negligent training, supervision, and discipline (Count VII); deliberate intention (Count VIII); failure to reasonably accommodate and wrongful discharge in violation of the West Virginia Human Rights Act, W. Va. Code § 5–11–1, *et seq.* (Count IV); wrongful discharge in violation of public policy (Count X); and workers' compensation wrongful discharge (Count XI). (*Id.*) For each of these claims, Plaintiffs seek compensatory and punitive damages, pre- and post-judgment interest, and attorney fees and costs. (*Id.*) Plaintiff Tamsen Balzano-Mull also claims loss of consortium derived from her husband's injury. (*Id.*) The pending motion for summary judgment was filed on July 1, 2019. (ECF No. 68.) Plaintiffs responded on July 22, 2019, (ECF No. 69), and Defendants filed a reply on August 5, 2019,[1] (ECF No. 70). As such, the motion is fully briefed and ripe for adjudication.

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

---

[1] The Court entered an order extending the deadline for the filing and briefing of dispositive motions. (ECF No. 62.) In accordance with that order, the parties' response and reply were timely filed.

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). In ruling on a motion for summary judgment, this Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)).

## III.    DISCUSSION

### A.  Fourth and Fourteenth Amendments Claim (Count I)

Plaintiffs allege that Griffith violated Mull's rights under the Fourth and Fourteenth Amendments to the United States Constitution by unlawfully and unreasonably seizing him during a physical altercation and causing him bodily injury, emotional distress, and other injuries. (ECF No. 38 at 5 ¶¶ 28–30.) They also allege that Wheeling implemented a "zero discipline" policy rather than a "zero tolerance" policy for workplace violence. Plaintiffs claim that because of this policy Griffith was not deterred from assaulting Mull and, thus, Wheeling is independently liable under 42 U.S.C. § 1983 for violating his substantive due process rights. (*Id.*; ECF No. 69 at 17–18.)

Section 1983 provides a civil cause of action to redress violations of the Constitution or of federal rights. *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979) (this "section is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."). It provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

4

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To be afforded relief in federal court under § 1983, a plaintiff must prove two elements. First, a plaintiff must show a "violation of a right secured by the Constitution and laws of the United States[.]" *West v. Atkins*, 487 U.S. 42, 48 (1988). Violations of the Fourth Amendment's prohibition of unreasonable seizures, *see, e.g., Tennessee v. Garner*, 471 U.S. 1, 25 (1985), or the Fourteenth Amendment's guarantee of substantive due process, *see, e.g., Collins v. City of Harker Heights*, 503 U.S. 115 (1992), satisfy this first prong. Second, a plaintiff must "show that the alleged deprivation was committed by a person acting under color of state law." *West*, 487 U.S. at 48 (citations omitted).

A person acts under color of state law when he exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Hughes v. Halifax Cty. Sch. Bd.*, 855 F.2d 183, 186 (4th Cir. 1988) (citing *Monroe v. Pape*, 365 U.S. 167, 184 (1961)). In other words, a person acts under color of state law only when "acting with power possessed by virtue of [his] employment with the state." *Edwards v. Wallace Cty. Coll.*, 49 F.3d 1517, 1522–23 (11th Cir. 1995) (citing *West*, 487 U.S. at 49). The Fourth Circuit has established "[a]s a general rule, 'a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.'" *Conner v. Donnelly*, 42 F.3d 220, 223 (4th Cir. 1994) (quoting *West*, 487 U.S. at 50; *see also Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 936 n.18 (1982) (finding that "state employment is generally sufficient to render the defendant a state actor").

Importantly, "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks and citations omitted); *see Screws v. United States*, 325 U.S. 91, 111 (1945) (noting that "acts of officers in the ambit of their personal pursuits are plainly excluded."). However, § 1983 "includes within its scope apparently private actions which have a 'sufficiently close nexus' with the State to be 'fairly treated as that of the State itself.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)); *see Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995) (stating that the actor's conduct will be attributed to the state when it "occurs in the course of performing an actual or apparent duty of his office, or . . . is such that the actor could not have behaved in that way but for the authority of his office.").

"[T]here is no specific formula for defining state action under this standard." *Rossignol*, 316 F.3d at 523 (internal quotation marks omitted). Rather, courts evaluate "the totality of the circumstances" to determine whether the challenged conduct is fairly attributable to the State. *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006) (internal quotation marks omitted); *see Griffin v. Maryland*, 378 U.S. 130, 135 (1964) (explaining that this inquiry involves determining not only whether the person possessed state authority but also whether he "purport[ed] to act under that authority," even if "he might have taken the same action had he acted in a purely private capacity."). "If a defendant's purportedly private actions are linked to events which rose out of his official status, the nexus between the two can play a role in establishing that he acted under color of state law." *Rossignol*, 316 F.3d at 524. In addition, "[w]here the sole intention of a

public official is to suppress speech critical of his conduct of official duties or fitness for public office, his actions are more fairly attributable to the state." *Id.*

Plaintiffs allege that Griffith was acting under color of law when he allegedly assaulted Mull. They argue that Griffith exercised his authority as a sergeant to order Mull to leave the office. When Mull did not follow his directions, Griffith attempted for a second time to remove him from the office by punching Mull in the face and holding him in a headlock. Defendants argue that Plaintiffs have not shown that Mull was acting under color of law at the time of the alleged altercation. They maintain that the incident at issue was nothing more "than a workplace altercation between coworkers who just happen to be police officers." (ECF No. 70 at 5.)

It is undisputed in this case that Griffith was on-duty and Mull's superior by rank at all relevant times. Plaintiffs suggest that but for Griffith's authority over Mull and his on-duty status the altercation could not have occurred. (ECF No. 69 at 14.) However, the law is settled that it is an officer's exercise of authority that brings conduct under color of law, not the coincidence of their co-employment. Thus, the fact that Griffith was on duty, in uniform, and Mull's superior when the events transpired at the department is not dispositive. *See, e.g., Pitchell v. Callan*, 13 F.3d 545, 548 (2d. Cir. 1994) (whether police officer was on or off duty when the challenged incident occurred is not dispositive); *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) (whether police officer is "in or out of uniform is not controlling").

The inquiry here turns on whether Griffith's actions "related in some meaningful way either to [his] governmental status or to the performance of his duties," *Martinez*, 54 F.3d at 987, in an effort to influence or affect Mull with his behavior. The *Martinez* court confronted a similar issue of whether the under color of law element is met in a case involving a police-on-police altercation.

In *Martinez*, one officer accidentally shot another officer in the groin while "horsing around." *Martinez*, 54 F.3d at 982. In concluding that the assailant's action was not under the color or pretense of law, the court considered the victim's behavior, which suggested that he was not intimidated by his perpetrator's official status. The court reasoned that if the altercation seems to be "of a distinctively personal nature, it can generally be assumed that the aggressor's official trappings, without more, will not lead the victim to believe that the aggressor is acting with the imprimatur of the state and, in turn, to forgo exercising his legal rights." *Id.* at 988 n.6 (acknowledging "the fact that [the victim] walked away numerous times shows that he was not so intimidated by [his aggressor's] status as a policeman as to cause him to refrain from exercising his legal rights." (internal quotation marks and citation omitted)). The *Martinez* decision is important for cases like this because it serves as a reminder that when determining whether a person acts under color of law courts must consider "the nature of his conduct in light of the totality of surrounding circumstances." *Id.* at 987 (citing *Pitchell*, 13 F.3d at, 548; *see also Holly*, 434 F.3d at 292; *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 872–73 (4th Cir. 1989).

Here, in asserting their claim that Griffith was acting under color of law, Plaintiffs begin with a description of an incident that occurred earlier that day. Griffith was off duty and accompanied his mother-in-law to inspect her rental property. He so happened at the time to be wearing a cut off t-shirt bearing the name "Wheeling PD SWAT." (ECF No. 68-3 at 7 (Griffith Dep.).) Their inspection later led to a disruption with a tenant that required the assistance of law enforcement. Mull testified that he questioned Griffith about his t-shirt once he returned on duty to the office. After he expressed disapproval of Griffith's behavior, Griffith ordered Mull to leave the office. According to Mull, Griffith then "struck him in the face" and restrained him in a

headlock. (ECF No. 68-2 at 4 (Mull Dep.); ECF No. 38 at 2 ¶ 8 (alleging Griffith "sucker punch[ed]" Mull in the face, placed him in a headlock, and continued to punch him on the head until Mull "was able to pull himself out of the headlock.").) Mull further testified that Griffith proceeded to order him to leave the office after the assault. (*Id.*)

Defendants' version of the events is quite different. First, Griffith disputes any assertion that he was acting in his official capacity during the rental inspection. He testified that he identified himself as a landlord to the tenant and was coincidentally wearing the Wheeling PD t-shirt. (ECF No. 68-3 at 6, 7 (Griffith Dep.).) Once he returned to the office, Mull persistently questioned Griffith about the prior incident that day. Griffith admits that he ordered Mull to leave the office using his authority as a police sergeant. (*Id.* at 4.) He further acknowledged that their encounter escalated into an argument after Mull refused to leave. (*Id.*) Griffith testified that he then pushed Mull, but he denies ever intentionally striking him. (*Id.* at 2.) Further, he testified that he only placed Mull in a headlock after Mull attempted to tie him up and start a wrestling match. (*Id.* at 4.)

First, that Griffith was acting pursuant to his official duties when he directed Mull to leave the office is unresponsive to whether he was acting or purporting to act pursuant to his official duties when he allegedly assaulted Mull. Second, whether Mull's criticisms of Griffith's behavior, which precipitated the alleged violence, was job-related is irrelevant to whether the altercation was instigated under pretense of law. The critical issues concerning whether Griffith purported to act under color of law are how and why the physical altercation occurred. Based upon the testimony, the Court finds that genuine issues of fact exist relating to whether Griffith's alleged conduct was pursuant to his authority such that his conduct was not only his, but also, in

fairness, the State's or whether his alleged conduct was simply a personal pursuit outside the scope of § 1983. How and why the altercation occurred are issues of fact to be resolved by a jury. Accordingly, the Court **DENIES** summary judgment under Count I as to Griffith.

Plaintiffs also seek to hold Wheeling liable under § 1983. A municipality can be liable under § 1983 "only where the municipality itself causes the constitutional violation at issue" through "the execution of [its] policy or custom . . . ." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see Hughes*, 855 F.2d at 186 (establishing that "[t]o establish municipal liability under § 1983, the plaintiff must show that the execution of a municipal policy or custom inflicts an injury."). "Municipal policy may be found in written ordinances and regulations, in certain affirmative decisions or individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (internal citations omitted).

Where there is no formal policy, a municipal "custom" may exist if an unconstitutional practice is "so persistent and widespread and so permanent and well settled as to constitute custom or usage with the force of law." *Id.* (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Under this theory, liability may only attach if "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* (citation omitted). For municipal liability to attach, the policy or custom must have a "specific deficiency or deficiencies . . . such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Id.* (citation omitted). Without a direct link between an official policy or custom and the plaintiff's alleged injuries, there is no basis for municipal liability under § 1983. *Id.* (explaining that "[a] careful

examination of this 'affirmative link' is essential to avoid imposing liability on municipal decisionmakers in the absence of fault and causation.).

In this case, Plaintiffs appear to allege municipal liability under both theories of a deliberately indifferent policy and a widespread custom. Plaintiffs argues that Wheeling's city manager has developed a policy that allows officers who violate Wheeling's "Workplace Violence Policy"[2] to resign in return for a verbal warning instead of facing formal discipline.[3] (ECF No. 69 at 17.) They claim that by failing to impose formal discipline in accordance with its "zero tolerance" policy, Wheeling fails to deter violence in the workplace and manifests deliberate indifference to such risk to its employees. (*See* ECF No. 69 at 17.)

Plaintiffs allegations fail to demonstrate an "affirmative link" between the official policy and Mull's injury. *Carter*, 164 F.3d at 218. The policy, at least as Plaintiffs portray, still ends the wrongdoer's employment with Wheeling, albeit through forced resignation or optional retirement as opposed to termination or other formal discipline, thereby reducing the risk of future harm to its employees. Also, Wheeling's city manager, Robert Herron, testified that Griffith would have received something more than a verbal warning, such as a three-day suspension without pay or a demotion, had he not retired. (*See* ECF No. 69-10 at 4 (Herron Rule 30(b)(6)

---

[2] The "Workplace Violence Policy" provides, in relevant part, the following:

> The City of Wheeling mandates a "zero tolerance for violence" environment and will make every effort to prevent incidents from happening. Violence, for the purpose of this policy, includes physically harming another, shouting, shoving, pushing, harassment, intimidation, coercion, brandishing weapons, abuse of power/authority and threats/talk of violence.

(ECF No. 69-2 at 29–30.)

[3] Plaintiffs cite West Virginia Code § 8–14A–1(7) for the proposition that formal discipline for law enforcement officers must be imposed in the form of "dismissal, demotion, suspension, reduction in salary, written reprimand or transfer for purposes of punishment."

Dep.).)   In light of his testimony, any assertion by Plaintiffs that Wheeling fails to impose formal punishment when it determines that an employee commits an act of violence as defined under the "Workplace Violence Policy" is unconvincing.   Nonetheless, it is apparent that a "close fit" between the policy and Mull's injury is lacking so as to show that Wheeling's choice not to impose formal discipline "was in fact the moving force behind" the alleged constitutional violation. *Carter*, 164 F.3d at 218.

As evidence of the existence of a widespread custom for failing to impose formal discipline, Plaintiffs point to one prior instance where an employee, who "showed up to work with alcohol in his system, was permitted to resign without discipline."   (ECF No. 69 at 18; ECF No. 69-9 at 2–3 (Roxby Dep.).)   The single incident that Plaintiffs offer as evidence of this alleged custom is neither persistent nor widespread.   *Lytle v. Doyle*, 326 F. 3d 463, 473 (4th Cir. 2003) ("It is well settled that 'isolated incidents' of unconstitutional conduct by subordinate employees are not sufficient to establish a custom or practice for § 1983 purposes.   Rather, there must be 'numerous particular instances' of unconstitutional conduct in order to establish a custom or practice.") (internal citations omitted).   In addition, this prior incident is wholly unrelated to the circumstances of Mull's alleged injury.   The fact that Wheeling once allowed a different employee to resign after coming to work with alcohol in his system does not demonstrate that Wheeling's "custom" made the alleged assault on Mull "almost bound to happen" or that it was the "moving force" behind his injuries.   *Carter*, 164 F.3d at 218.

In sum, Plaintiffs fail to meet the standard for proceeding with a § 1983 claim against Wheeling for deliberate indifference pursuant to a deficient policy or custom.   No clear pattern of deliberate indifference to violence in the workplace has been put forth, no omissions on the part

of Wheeling's policymaking officials have been shown to manifest deliberate indifference to the risk of violence, and, critically, Plaintiffs have not shown how a particular policy and custom directly caused the specific violation at issue. Summary judgment in favor of Wheeling on this claim is therefore **GRANTED**.

### B. First Amendment Claim (Count II)

Plaintiffs assert a claim against Defendants under § 1983 for retaliation in violation of the First Amendment. (ECF No. 38 at 6 ¶¶ 31–32.) Plaintiffs allege in a one sentence response to Defendants' motion for summary judgment that Griffith punched Mull "because he didn't like [Mull]'s conversation about Griffith having a SWAT T-shirt on" when he was involved in an incident off duty that required law enforcement assistance. (ECF No. 69 at 18.) He claims that he is entitled to recover against Defendants because Griffith's conduct violated his freedom of speech rights.

The First Amendment protects "the right to be free from retaliation by a public official for the exercise of [freedom of speech]." *Smith v. Gilchrist*, 749 F.3d 302, 308 (4th Cir. 2014) (internal marks and quotation omitted). To establish a § 1983 First Amendment retaliation claim, a plaintiff must establish three elements: "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (alterations and internal quotation marks omitted).

Defendants argue that Plaintiffs have made no evidentiary showings and cannot establish the elements of their claim. The Court agrees that Plaintiffs have proffered no evidence to support

their claims much less "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citation omitted). Accordingly, Defendants are entitled to summary judgment on Count II and thus their motion is **GRANTED**.

### C.  Eighth Amendment Claim (Count III)

Plaintiffs allege that the alleged assault and battery to Mull constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. (ECF No. 38 at 6 ¶¶ 33–36.) The Eighth Amendment "was designed to protect those convicted of crimes and consequently the Clause applies only after the State has complied with constitutional guarantees traditionally associated with criminal prosecutions." *Whitley v. Albers*, 475 U.S. 312, 318 (1986) (citation and internal quotations omitted). Thus, the Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until "after sentence and conviction." *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989); *see, e.g., Ingraham v. Wright*, 430 U.S. 651, 667–68 (1977) (the Eighth Amendment is inapplicable outside of the criminal process); *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979) (noting that the Eighth Amendment applies only to punishment imposed on those convicted of crimes). Griffith's conduct falls outside the scope of this provision because the alleged assault and battery was not punishment for a crime. Therefore, as this claim is without merit, the Court **GRANTS** Defendants summary judgment on this ground.

### D.  Assault and Battery (Count IV)

Count IV of the Amended Complaint alleges that both Defendants are liable for assault and battery against Mull. (ECF No. 38 at 6 ¶¶ 37–38.) While political subdivisions may be "liable for injury, death, or loss to persons or property caused by the negligent performance of acts by

14

their employees while acting within the scope of employment", W. Va. Code § 29–12A–4(c)(2), they are immune to liability for the intentional acts of their employees, *see Mallamo v. Town of Rivesville*, 477 S.E.2d 525, 533 (W. Va. 1996). Assault and battery are intentional acts under West Virginia law. *See Tolliver v. Kroger Co.*, 498 S.E.2d 702, 711 (W. Va. 1997) (establishing intent to cause harmful or offensive contact as an element of common law battery); *see also* 2 Am. Jur., Assault and Battery, §§ 2, 5 (discussing intent to commit battery as an element of common law assault). In light of these principles, Plaintiffs concede that summary judgment in favor of Wheeling is appropriate. Thus, summary judgment is **GRANTED** on Count IV with respect to Wheeling.

As for Griffith, Defendants do not move for summary judgment on this claim. Plaintiffs, likewise, do not move for summary judgment but merely suggest that the Court should *sua sponte* grant summary judgment against Griffith on liability. (ECF No. 69 at 19.) Under West Virginia law, an "assault occurs when one person puts another in reasonable fear or apprehension of an imminent battery and battery is any harmful or offensive contact." *Hutchinson v. W. Va. State Police*, 731 F. Supp. 2d 521, 547 (S.D. W. Va. 2010) (citing *W. Va. Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 494–95 (W. Va. 2004)). As stated previously, both offenses require that the offender act with intent. *See id.* (citing Restatement (Second) of Torts §§ 18, 21 (1965)).

As discussed previously, Mull testified that during his discussion with Griffith he "was struck in the face and then put in a headlock[.]" (ECF No. 38-2 at 5 (Mull Dep.).) According to Griffith, however, he pushed Mull by the shoulders. (ECF No. 68-3 at 4 (Griffith Dep.).) He testified that Mull then approached him and the two began to wrestle. Mull "tried to tie [him] up" and as he did so the clasp on Griffith's watch came undone and cut Mull's mouth. (*Id.*) Griffith

testified that although he may have accidentally hit Mull, (*id.* at 2), he never did so intentionally, (*id.*). Patty Boniey was a witness to the altercation. Her deposition testimony confirms that the officers wrestled and also suggests that Mull might have initiated the altercation. (ECF No. 68-4 at 3 (Boniey Dep.) (testifying, "A: . . . Mull was like right here against Jeff. And the next thing I know, they were into it. Q: Wrestling? A: Yeah. More or less. I don't know who came at who first.")). Based upon the evidence, the Court finds that there are issues of material fact concerning Griffith's intent to offend, harm, or place Mull in reasonable fear. Therefore, Plaintiffs are not entitled to summary judgment insofar as they seek judgment as a matter of law against Griffith for assault and battery.[4]

### E.  Tort of Outrage (Count V)

Plaintiffs claim that the alleged January 22, 2016, assault and battery by Griffith also amounts to outrage or intentional infliction of emotional distress. (ECF No. 38 at 6 ¶¶ 39–40.) In West Virginia, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Syl. pt. 6, *Harless v. First Nat. Bank in Fairmont*, 289 S.E.2d 692, 694 (W. Va. 1982). The West Virginia Supreme Court of Appeals has set forth the following elements necessary to establish a tort of outrage or intentional infliction of emotional distress:

> (1) That defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) That the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) That the actions of the defendant caused the plaintiff to suffer emotional distress; and (4)

---

[4] Considering Plaintiffs have a remaining actionable tort against Griffith for assault and battery, Plaintiff Tamsen Balzano-Mull's loss of consortium claim stands. Defendants' motion for summary judgment to dismiss her claim on the basis that it is derivative of Mull's claims is, therefore, **DENIED**.

That the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Philyaw v. E. Associated Coal Corp.*, 633 S.E.2d 8, 13 (W. Va. 2006) (quoting syl. pt. 3, *Travis v. Alcon Labs.*, 504 S.E.2d 419, 425 (W. Va. 1998)). The court further explained that "whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." Syl. pt. 4, *Travis*, 504 S.E.2d at 421. This claim requires conduct that is "more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct." *Id.* at 425 (citation omitted). Moreover, "conduct that is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent does not constitute outrageous conduct. On the other hand, outrageous conduct can include physical violence that causes bodily harm and emotional distress." *Courtney v. Courtney*, 413 S.E.2d 418, 423–24 (W. Va. 1991) (internal citations removed).

In their motion for summary judgment, Defendants argue that Griffith's alleged conduct does not reach the level of severity required under West Virginia law to support the tort of outrage. Further, Defendants assert that Wheeling is entitled to immunity for any alleged intentional acts by Griffith. (ECF No. 68-1 at 13.) Plaintiffs concede that Mull's outrage claim against Wheeling lacks merit. Like assault and battery, outrage, or intentional infliction of emotional distress, also is an intentional tort as its name implies. *See Harless v*, 289 S.E.2d at 693–94 (noting "the tort of outrage is merely an extension of the right to recover damages for emotional distress into areas involving nontraditional intentional torts"). Under West Virginia law, Wheeling is immune from liability for any outrageous conduct intentionally caused by Griffith. *See* W. Va. Code § 29–12A–4(c)(2). Accordingly, the Court **GRANTS** summary judgment to Wheeling on this claim.

Turning to the claim against Griffith, the dispute in this case is primarily factual, rather than legal. There is little dispute that Griffith returned to the office and began discussing an incident that occurred while he was off duty. Mull was not a participant in the discussion but nonetheless questioned Griffith's conduct and interjected his disapproval of Griffith's behavior. At that point, the parties' stories diverge. Mull claims that Griffith suddenly punched him in the face.[5] (ECF No. 68-2 at 4 (Mull Dep.)) Notably, however, he does not recall who made initial bodily contact. (*Id.* at 5; *see* ECF No. 68-4 at 3 (Boniey Dep.).) Meanwhile, Griffith claims that he was stressed and directed Mull to leave the office. (ECF No. 68-3 at 4 (Griffith Dep.).) Their argument quickly escalated into a physical altercation after Mull ignored his instructions to leave and Griffith then pushed him out of the office. (*Id.* (stating "I ordered him out of the office, and he refused to go. So I took him by the shoulders and pushed him out of the office. And that's when he decided to make it a wrestling match.".) Although Griffith had Mull in a headlock, he denies intentionally hitting him. (*Id.* at 2.)

Based upon these disputed facts, Griffith's conduct could reasonably be considered outrageous. A jury could determine that Griffith's alleged conduct was intentional and malicious, and that emotional distress, such as humiliation, is a natural and substantially certain result of a physical altercation with a superior officer, particularly when in the presence of co-workers. *See Travis*, 504 S.E.2d at 426–27 (discussing cases where "the existence of a special relationship in which one person has control over another, as in the employer-employee relationship, may produce a character of outrageousness that otherwise might not exist." (citing *Bridges v. Winn–Dixie*

---

[5] Specifically, Mull testified that "[Griffith] was talking about the incident and that's when I asked him what kind of shirt he was wearing during the incident, and he didn't answer me. And I said, 'Jeff, what kind of shirt were you wearing?' And he said, 'I was wearing a Wheeling PD SWAT shirt.' And I said, 'Exactly, Jeff.' And then I was struck in the face. And I recall being put in a headlock[.]" (ECF No. 68-2 at 4 (Mull Dep.).)

*Atlanta, Inc.*, 335 S.E.2d 445, 448 (Ga. 1985))).   Issues of material fact preclude the Court from determining whether Griffith's conduct "was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency."   *Philyaw*, 633 S.E.2d at 13.   Therefore, the Court **DENIES** Defendants' motion for summary judgment with respect to Griffith on the tort of outrage claim.

F.   *Negligence (Count VI)*

Count VI of the Amended Complaint asserts a common law and statutory negligence claim against Defendants under the theory of *respondeat superior*.   (ECF No. 38 at 6–7 ¶¶ 41–42.) Under the doctrine of *respondeat superior*, an employer can be held vicariously liable for the tortious acts of its employee committed within the scope of employment.   *See* W. Va. Code § 29–12A–4(c)(2) (providing that an employer may be "liable for injury, death, or loss to persons or property caused by the negligent performance of acts by their employees while acting within the scope of employment."); *see also Barath v. Performance Trucking Co.*, Inc., 424 S.E.2d 602, 605 (W. Va. 1992) (holding "that if it can be shown that an individual is an agent and if he is acting within the scope of his employment when he commits a tort, then the principal is liable for the tort as well as the agent.").   "Scope of employment" means "performance by an employee acting in good faith within the duties of his or her office or employment or tasks lawfully assigned by a competent authority but does not include corruption or fraud."   W. Va. Code § 29–12A–3(d); syl. pt. 6, *Courtless v. Jolliffe*, 507 S.E.2d 136, 137 (W. Va. 1998) ("An act specifically or impliedly directed by the master, or any conduct which is an ordinary and natural incident or result of that act, is within the scope of the employment." (citation omitted)).

Nevertheless, under West Virginia's Workers' Compensation statute, employers are entitled to immunity from liability for work-related injuries brought by employees.   *See* W. Va.

Code § 23–2–6 (stating employers are "not liable to respond to damages at common law or by statute for the injury or death of any employee however occurring . . . ."). Employers are entitled to this immunity so long as the employer did not act with "deliberate intention." *See* W. Va. Code § 23–4–2(d)(2).

Defendants move for summary judgment on this count only as to Wheeling. First, they argue that Wheeling is not vicariously liable for Griffith's alleged conduct since it occurred outside the scope of his employment. Second, they argue that Wheeling, as Mull's employer, is entitled to statutory workers' compensation immunity as Plaintiffs have proffered no evidence of deliberate intent. (ECF No. 68-1 at 13–14.) Plaintiffs concede that Wheeling is entitled to workers' compensation immunity under West Virginia Code § 23–2–6. Accordingly, based upon Plaintiffs' concession, summary judgment is **GRANTED** in favor of Wheeling with respect to Count VI.

### G.  Negligent Training, Supervision, and Discipline (Count VII)

Plaintiffs asserts a negligent training, supervision and discipline claim against Wheeling. (ECF No. 38 at 7 ¶¶ 43–44.) Under West Virginia law, claims of negligent training and supervision are governed by general negligence principles. *See, e.g., Neiswonger v. Hennessey*, 601 S.E.2d 69, 73 (W. Va. 2004) (recognizing negligent hiring, training, and supervising as a cause of action grounded in state law and distinct from claims asserted under § 1983); *Taylor v. Cabell Huntington Hosp., Inc.*, 538 S.E.2d 719, 725 (W. Va. 2000) (treating negligent supervision like other claims based in negligence). To establish a negligent supervision claim, a plaintiff must show "that the employer failed to properly supervise its employees and, as a result, those employees proximately caused injury to another." *Biser v. Mfrs. and Traders Trust Co.*, 211 F.

Supp. 3d 845, 856 (S.D. W. Va. 2016) (citing *Ferrell v. Santander Consumer USA, Inc.*, 859 F.Supp.2d 812, 817–18 (S.D. W. Va. 2012)). As with general negligence, "the analysis centers on whether the employer was on notice of the employee's propensity (creating a duty), yet unreasonably failed to take action (manifesting a breach), resulting in harm to a third-party from the employee's tortious conduct." *Radford v. Hammons*, No. 2:14–24854, 2015 WL 738062, at *7 (S.D. W. Va. Feb. 20, 2015) (citation omitted).

In support of their claim, Plaintiffs reference one incident in 2010 where a former police officer, Michael Vapner, made a complaint against Griffith for alleged workplace violence. In his affidavit, Vapner states that he was disciplined but that "[he] was not made aware of any discipline given to [Griffith]." (ECF No. 69-4 at 2 (Vapner Affidavit).) This isolated incident is insufficient to create an inference that Wheeling failed to adequately supervise Griffith or take other action to prevent harm to other employees. In addition, conclusory allegations and subjective beliefs about any disciplinary action taken against Griffith is inadequate to show that Wheeling failed to train, supervise, or even discipline him throughout the course of his employment. Plaintiffs provide no indication that simply because a complaint was filed against Griffith under Wheeling's "Workplace Violence Policy" that Wheeling has inadequately trained him or that any proposed deficiency contributed to his injuries. *See Mrotek v. Coal River Canoe Livery, Ltd.*, 590 S.E.2d 683, 685 (W. Va. 2003) (quoting *Walton v. Given*, 215 S.E.2d 647, 651 (W. Va. 1975) (observing that negligence must not be inferred based on the existence of an injury alone)). Thus, Plaintiffs have not met their burden to establish that Wheeling breached any duty to train and supervise Griffith or that any potential breach proximately caused Mull's injuries.

Accordingly, summary judgment in favor of Wheeling is appropriate, and Defendants' motion is **GRANTED** with respect to this claim.

### H. Deliberate Intention (Count VIII)

Plaintiffs assert a deliberate indifference claims under West Virginia Code § 23–4–2(d) against both Griffith and Wheeling. (ECF No. 38 at 7 ¶¶ 45–46.) As stated previously, employers who provide workers' compensation coverage have statutory immunity from tort actions against them by their employees. *See* W. Va. Code § 23–2–6. This immunity extends to "every officer, manager, agent, representative, or employee" of the employer who is acting within the scope of their employment. W. Va. Code 23–2–6a. However, this immunity may be pierced when an employer or person against whom liability is asserted acts with deliberate intention. *See* W. Va. Code § 23–4–2(d)(2). Under this statute, deliberate intention can be established where "the employer or person against whom liability is asserted acted with a consciously, subjectively and deliberately formed intention to produce the specific result of injury . . . ." W. Va. Code § 23–4–2(d)(2)(A). Here, Plaintiffs allege that because Griffith, as a management employee of Wheeling, acted with deliberate indifference in causing Mull's specific injury, both Defendants are liable to Plaintiffs pursuant to West Virginia Code § 23–4–2(d).

Defendants argue that Plaintiffs have proffered no evidence of Griffith acting with "consciously, subjectively and deliberately formed intent" to cause Mull injury. The Court disagrees and finds that Mull's deposition testimony, adduced in this case, places Griffith's intent at issue. However, as discussed above, a genuine issue of fact exists as to whether Griffith intended to strike Mull let alone cause his specific injury. Accordingly, Defendants' motion for summary judgment is **DENIED** with respect to the deliberate intent claims.

*I. Failure to Reasonably Accommodate and Wrongful Discharge in Violation of the West Virginia Human Rights Act (Count IX)*

Count IX asserts a wrongful discharge claim against Defendants for failure to accommodate in violation of the West Virginia Human Rights Act ("WVHRA").[6] (ECF No. 38 at 13–14 ¶¶ 91–98.) The WVHRA prohibits an employer from discriminating "against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is . . . disabled." W. Va. Code § 5–11–9(1). In other words, it is unlawful "to exclude from, or fail or refuse to extend to, a person equal opportunities" based on several protected classes, including disability. W. Va. Code § 5–11–3(h). "Disability" is defined within the Act as "[a] mental or physical impairment which substantially limits one or more of such person's major life activities," including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working," having "[a] record of such impairment" or "[b]eing regarded as having such an impairment." W. Va. Code § 5–11–3(m)(1)–(3); *see Ruckel v. Sears, Roebuck & Co.*, 287 F. Supp. 2d 652, 655 (S.D. W. Va. 2003) (summarizing the definition of a "disability" to mean the plaintiff (1) "has a physical or mental impairment substantially limiting one or more major life activities (disabled in fact); or (2) is either correctly or incorrectly regarded as having an impairment and/or substantial limitation (regarded as disabled).") (quotation omitted).

The WVHRA, is often analyzed under its federal equivalents—particularly the Americans with Disabilities Act ("ADA"), among others. *See Hosaflook v. Consolidation Coal Co.*, 497

---

[6] In their response to Defendants' motion for summary judgment, Plaintiffs concede that their wrongful discharge claim against Griffith is without merit. (ECF No. 69 at 20.) Indeed, Griffith was not Mull's employer and, therefore, cannot be liable for any wrongful discharge by his employer. Accordingly, summary judgment is **GRANTED** to Griffith on Count IX.

S.E.2d 174, 181 n.10 (W. Va. 1997) (noting that "cases decided under the ADA are also helpful in deciding our cases under the [WVHRA]"); *see also Calef v. FedEx Ground Packaging Sys., Inc.*, 343 F. App'x 891, 897 (4th Cir. 2009) (acknowledging that this state statute "often correspond[s] with—but sometimes stray[s] from" the federal counterparts.).

To establish a wrongful discharge claim under the WVHRA, a plaintiff must prove that (1) he or she meets the definition of "disabled" within the meaning of the WVHRA, (2) "he or she is a 'qualified disabled person,' and (3) he or she was discharged from his or her job." *Hosaflook*, 497 S.E.2d at 175. After establishing a *prima facie* case, the burden then shifts to the employer to provide a legitimate nondiscriminatory reason for the adverse employment action. *Conaway v. E. Associated Coal Corp.*, 358 S.E.2d 423, 430 (W. Va. 1986). "The reason need not be a particularly good one" and "can be any other reason except that the plaintiff was a member of a protected class." *Id.* Once the employer has provided such a reason, "the employee will have the chance to rebut the employer's evidence with a showing that the stated reason was merely a pretext for discriminatory motive." *Id.*

Similarly, to succeed on a claim for failure to accommodate under the WVHRA, Plaintiffs must establish the following elements:

> (1) The plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or should have known of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation.

*Kitchen v. Summers Continuous Care Center, LLC*, 552 F. Supp. 2d 589 (S.D. W. Va. 2008) (citing syl. pt. 2, *Skaggs v. Elk Run Coal Co.*, 479 S.E.2d 561 (W. Va. 1996)).

Plaintiffs' claim rests on the assertion that Mull's disability, *i.e.* post-concussion syndrome, affected his "thought possesses [*sic*: process] and mentations."  (ECF No. 69 at 20.)   They claim that Wheeling should have known Mull's judgment was impaired when he altered his 48-hour doctor's excuse to 5 days and, thus, the WVHRA required Wheeling to either excuse his misconduct or impose a method of discipline other than termination.   Defendants assert that they are entitled to summary judgment on Plaintiffs' claim under the WVHRA because Plaintiffs have proffered no evidence to establish that Mull was disabled or that he was a "qualified disabled person" at the time of his termination, that Defendants knew of such disability, that he was denied a reasonable accommodation, and that he asked for a reasonable accommodation.

First, with respect to disability, Plaintiffs allege that Mull was disabled for sustaining post-concussion syndrome and appear to proceed under the premise that Wheeling had "[a] record of such impairment."  W. Va. Code § 5–11–3.   Plaintiffs claim that Wheeling received Mull's medical records through his workers' compensation claim.   They reference his health records, which reflect that Mull "continued to work but had to take intermittent time off due to symptoms of headache, difficulty concentrating, blurred vision and feeling anxious."  (ECF No. 69 at 21; ECF No. 69-2 at 54 (Workers' Compensation Evaluation Report).)   In addition, Mull's neuropsychologist diagnosed Mull with a "cerebral concussion" and opined that "[h]e is in no way to be standing in a judgment over any of the population" or to be "using his firearm."  (ECF No. 69-2 at 59.)   They also claim Mull advised Wheeling's police chief after the alleged altercation that he was sleeping poorly and felt "off his game."  (ECF No. 69 at 21.)   These undisputed facts establish that Mull was disabled and suffered from an impairment that limited him from performing at least one of his duties as a police officer.

Next, Plaintiffs must demonstrate that Mull was a "qualified disabled individual." A "qualified disabled person" is one who is able "to perform essential functions of the job" whether or not he requires reasonable accommodation. *Skaggs v*, 479 S.E.2d at 575 n.9 (citing *Ranger Fuel Corp. v. W. Va. Human Rights Comm'n*, 376 S.E.2d 154 (W. Va. 1988)). Plaintiffs introduce no evidence, nor do they argue, that Mull could have been a qualified disabled person if Wheeling had offered him some reasonable accommodation. Moreover, Plaintiffs do not claim nor does the record reflect that Mull was not permitted to take leave recommended by his doctor or that he requested and was denied additional leave to treat or recover from his disability. *See* syl. pt. 4, *Haynes v. Rhone–Poulenc, Inc.*, 521 S.E.2d 331 (W. Va. 1999) (providing that temporary leave may be a reasonable accommodation "for the purpose of recovery from or improvement of the disabling condition that gives rise to an employee's temporary inability to perform the requirements of his or her job.").

Instead, Plaintiffs merely suggest that Wheeling should have disciplined Mull for altering his doctor's excuse in a manner less severe than termination. (ECF No. 38 at 13 ¶ 94.) However, the accommodation Mull sought, namely that he receive a penalty other than termination, is simply a request that Wheeling accept and excuse his misconduct. Excusing workplace misconduct, forgery in this instance, cannot logically qualify as a reasonable accommodation that would have enabled Mull to perform the essential duties of his job. In fact, courts have explicitly rejected this notion. *See, e.g., Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999) (holding that "the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability.") (citing cases); *Canales-Jacobs v. New York State Office of Court Admin.*, 640 F. Supp. 2d 482, 500 (S.D. N.Y. 2009)

(noting that the ADA "does not excuse workplace misconduct because the misconduct is related to a disability").

As the West Virginia Supreme Court noted in *Skaggs*, the WVHRA "mandates common sense courtesy and cooperation." 479 S.E.2d at 577 (explaining that an "'[a]ccommodation' implies flexibility, and workplace rules, classifications, schedules, etc. must be made supple enough to meet that policy.").[7] Though an employer is not required to offer the exact accommodation an employee requests, "[t]he employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Id.* at 577 n.14 (citing *Vande Zande v. Wisconsin Dept. of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995)). Beyond their conclusory assertions, Plaintiffs offer no support to show that Mull was a "qualified disabled individual" within the meaning of the WVHRA. Accordingly, as Plaintiffs have failed to establish a *prima facie* case under the WVHRA, the Court **GRANTS** summary judgment in favor of Wheeling under this claim.

## J.   *Wrongful Discharge in Violation of Public Policy (Count X)*

Count X of the Amended Complaint asserts a wrongful discharge claim against Defendants in violation of West Virginia public policy. (ECF No. 38 at 14 ¶¶ 99–101.) West Virginia generally follows the common law rule that an employer can terminate an employee at will, with or without cause. *See Harless*, 246 S.E.2d at 275. However, in *Harless*, the West Virginia Supreme Court of Appeals recognized that when "the employer's motivation for the discharge

---

[7] The West Virginia Supreme Court stated that "[r]easonable accommodations include, but are not limited to altering facilities; restructuring jobs, work schedules, and assignments; reassigning the employee to a vacant position for which the person is able and competent . . . to perform; acquiring or modifying equipment to provide readers or interpreters; adjusting testing, training materials, or policies; and educating fellow workers." *Skaggs*, 479 S.E.2d at 576 (quoting 77 W. Va. C.S.R. 1, § 4.5).

contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by the discharge." *Id.* This exception forms the cause of action for wrongful discharge in violation of public policy. To prevail on this claim, the plaintiff must establish that a substantial public policy exists. *See Wounaris v. W. Va. State Coll.*, 588 S.E.2d 406, 413 (W. Va. 2003). Once established, the plaintiff must show by a preponderance of the evidence that the "discharge was motivated by an unlawful factor contravening that policy." *Id.* (citation omitted). The employer will be liable for the discharge unless it can demonstrate by a preponderance of the evidence that the employee would have suffered the same termination absent an unlawful motive. *Id.*

It is well established that "public policy is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against public good even though no actual injury may have resulted therefrom in a particular case to the public." *Cordle v. General Hugh Mercer Corp.*, 325 S.E.2d 111, 114 (W. Va. 1984) (internal quotation marks and citation omitted). When deciding what constitutes public policy, courts look to statutes, constitutional provisions, regulations, and judicial opinions to determine if a given practice is endorsed or prohibited. *See* syl. pt. 2, *Birthisel v. Tri–Cities Health Servs. Corp.*, 424 S.E.2d 606 (W. Va. 1992). In order to sustain a cause of action for wrongful discharge, the public policy relied upon must be substantial. "Inherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person." *Id. See Feliciano v. 7– Eleven, Inc.*, 559 S.E.2d 713, 718 (W. Va. 2001) (noting that "to be substantial, a public policy must not just be recognizable as such but must be so widely regarded as to be evident to employers and employees alike."). Courts must use care in creating new public policy "absent some prior

legislative or judicial expression on the subject." *Tiernan v. Charleston Area Med. Ctr., Inc.*, 506 S.E.2d 578, 584 (W. Va. 1998) (internal citations omitted). Additionally, "despite the broad power vested in the courts to determine public policy," courts are to "exercise restraint" when using such power. *Id.* at 584.

The West Virginia Supreme Court has expounded upon these principles and provided four elements necessary to state a claim for public policy wrongful discharge:

> (1) that a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) that plaintiff's dismissal was motivated by conduct related to the public policy (the causation elements); (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Feliciano*, 559 S.E.2d at 723 (internal quotations and citations omitted).

In this case, Plaintiffs allege that Wheeling wrongfully terminated Mull for instituting criminal proceedings against Griffith in violation of West Virginia public policy. (ECF No. 38 at 14 ¶¶ 99–101.) Defendants argue that this cause of action must be dismissed because the prosecution of a crime does not provide a basis for a *Harless* claim. Additionally, Defendants argue that even if the filing a criminal complaint is public policy that satisfies *Harless*, there is no evidence in the record to establish that Mull was terminated because he attempted to have Griffith criminally prosecuted. (ECF No. 68-1 at 18.)

In support of their claim, Plaintiffs cite language from two cases, stating "public policy favors prosecution for crimes, and requires the protection of a person who in good faith and upon reasonable grounds institutes proceedings upon a criminal charge." (*See* ECF No. 69 at 22 (citing *Jarvis v. W. Va. State Police*, 711 S.E.2d 542 (W. Va. 2010) and *McNair v. Erwin*, 99 S.E. 454,

455 (W. Va. 1919)).).  Plaintiffs are incorrect to rely on *Jarvins* and *McNair* for the proposition that they recognize a public policy favoring the prosecution of crimes generally.  In these two cases, such public policy was recognized by the West Virginia Supreme Court specifically in the context of malicious prosecution and retaliatory prosecution claims.  *See Jarvis*, 711 S.E.2d at 549 (stating that "criminal prosecutions should be encouraged in appropriate cases without fear of reprisal by civil actions" (internal quotation marks and citation omitted)).  Presumably the same can be said of employees who fear discharge.  However, the Court declines to hold from these two cases an all-encompassing exception, which declares that filing a criminal complaint against a co-employee is a substantial public policy actionable under *Harless*, without a clear mandate from the Legislature or the West Virginia Supreme Court.

In other cases, West Virginia courts have recognized *Harless* claims for filing a civil action against an employer in an attempt to collect overtime wages.  *See McClung v. Marion Cty. Comm'n.*, 360 S.E.2d 221 (W. Va. 1987).  It has found an implication of substantial public policy where an employee brings to the attention of federal prosecutors improprieties in the operation of a housing authority.  *See Slack v. Kanawha Cty. Hous. & Redevelopment Auth.*, 423 S.E.2d 547 (W. Va. 1992).  Additionally, the WVHRA prohibits an employer from retaliating or otherwise discriminating against an employee for filing a complaint under the Act.  *See* W. Va. Code § 5–11–9(7)(C).  In *Swears v. R.M. Roach & Sons, Inc.*, the West Virginia Supreme Court acknowledged that "if a case arises in which" alleged criminal conduct is reported "to the proper authorities, such a factual scenario could present a question as to whether there is a substantial public policy to protect an employee, of a private employer, who reports suspected criminal conduct to the appropriate governmental authorities and is retaliated against as a result of such

reporting. 696 S.E.2d 1, 7 n.8 (W. Va. 2010). However, neither the Legislature nor the court

has gone so far as to articulate a clear public policy against retaliation for pursuing criminal charges

against a co-worker.

Even so, the Court need not determine whether the right to institute criminal proceedings

is a substantial public policy of this state. Implicit in West Virginia case law is the principle that

an employer may not be held liable for wrongful discharge when the employer has a legitimate

reason for discharging an employee, regardless of any constitutional, statutory, or regulatory

provision that might serve as the basis of a substantial public policy. *See Feliciano*, 559 S.E.2d

at 723. In this case, the Court finds that Mull's misconduct in submitting a forged doctor's excuse

is a legitimate reason for his discharge. Wheeling is entitled to summary judgment on this claim

and, accordingly, Defendants' motion under Count X is **GRANTED**.

### K. Workers' Compensation Wrongful Discharge (Count XI)

Plaintiffs claim that Mull was terminated in violation of West Virginia Code § 23–5A–1

because he filed a workers' compensation claim.[8] (ECF No. 38 at 14 ¶¶ 102–103.) West

Virginia Code § 23–5A–1 prohibits an employer from discriminating "in any manner against any

of his present or former employees because of such present or former employee's receipt of or

attempt to receive benefits under this chapter." Alleged violations brought under this section are

analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*.

*See Skaggs*, 479 S.E.2d at 581 (citing *McDonnell Douglas*, 411 U.S. 792 (1973)). The plaintiff

has the initial burden of offering evidence to make out a *prima facie* case of discrimination. *Id.*

To do so, three facts must be shown: "(1) an on-the-job injury was sustained; (2) proceedings were

---

[8] Again, Plaintiffs concede that this claim against Griffith is without merit as he did not employ Mull. (ECF No. 69 at 24.) Therefore, the Court **GRANTS** Griffith's motion for summary judgment on Count XI.

instituted under the Workers' Compensation Act, W. Va. Code 23–1–1, *et seq.*; and (3) the filing

of a workers' compensation claim was a significant factor in the employer's decision to discharge

or otherwise discriminate against the employee." *Fravel v. Sole's Elec. Co.*, 624 S.E.2d 524, 525

(W. Va. 2005). If the plaintiff establishes a *prima facie* case, "[t]he burden of production then

shifts to the employer to come forward with a legitimate, nondiscriminatory reason for its actions."

*Skaggs*, 479 S.E.2d at 582. If the employer meets this burden, "the onus is once again on the

employer to prove that the proffered legitimate reason is a mere pretext rather than the true reason

for the challenged employment action." *Id.* (citation omitted).

Here, Plaintiffs lack any direct or indirect evidence to establish the third element of a *prima*

*facie* discrimination case, namely that "the filing of a workers' compensation claim was a

significant factor in [Wheeling's] decision to discharge or otherwise discriminate against [Mull]."

*Fravel*, 624 S.E.2d at 525. With respect to the third element, the West Virginia Supreme Court

has explained the following:

> What is required of the plaintiff is to show some evidence which would sufficiently
> link the employer's decision and the plaintiff's status as a member of the protected
> class so as to give rise to an inference that the employment decision was based on
> an illegal discriminatory criterion. This evidence could, for example, come in the
> form of an admission by the employer, a case of unequal or disparate treatment
> between members of the protected class and others by the elimination of the
> apparent legitimate reasons for the decision, or statistics in a large operation which
> show that members of the protected class received substantially worse treatment
> than others.

*Conaway v. E. Associated Coal Corp.*, 358 S.E.2d 423, 429–30 (W. Va. 1986). Courts may also

consider indirect evidence, including "[p]roximity in time", [e]vidence of satisfactory work

performance and supervisory evaluations" and "[a]ny evidence of an actual pattern of harassing

conduct . . . ." *Powell v. Wyoming Cablevision, Inc.*, 403 S.E.2d 717, 721 (W. Va. 1991).

Plaintiffs assert that Wheeling initially did not protest the compensability of Mull's injury but later did. They characterize this change in position as an "admission" but fail to explain what exactly Wheeling thereby admitted. (ECF No. 69 at 23.) Regardless, in no way can Wheeling's challenge to Mull's workers' compensation claim be interpreted as an admission to terminating Mull because he applied for benefits. (*See* ECF No. 69-8 at 3 (Haymaker Dep.) (explaining that claims are approved when an employee has a right to pursue benefits, but this approval does not necessarily mean that the employer agrees that the alleged injury is a result of any work-related incident).)

Further, Plaintiffs allege that Wheeling treated him differently from a former police officer, Sgt. Roxby, who falsified a background check request form to investigate an individual for personal reasons. (ECF No. 69-5 (Roxby Internal Investigation Report).) According to Plaintiffs, an investigation was conducted, and Sgt. Roxby was given a written warning for misusing the background check system. Sgt. Roxby had not applied for workers' compensation and was not terminated for falsifying a document. Plaintiffs argue that a comparison of the misconduct by Sgt. Roxby to that of Mull, who had filed a workers' compensation claim and was terminated for forging a doctor's note, shows disparate treatment by Wheeling. (ECF No. 69 at 23–24.)

Disparate treatment requires a showing that "that the misconduct for which [the plaintiff] was discharged was nearly identical to that engaged in by" a retained employee outside of the protected class. *Rogers v. Henry Schein, Inc.*, No. 3:08-1022, 2008 WL 11429695, at *2 (S.D. W. Va. Dec. 16, 2008) (citing *State ex rel. State Human Rights Comm'n v. Logan-Mingo Area Mental Health Agency*, Inc., 329 S.E.2d 77, 84 (W. Va. 1985) (internal citations and quotations

omitted)); *see Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 162–63 (W. Va. 1995) (providing that a plaintiff must establish that "a nonmember of the protected group was not disciplined, or was disciplined less severely, than the complainant, though both engaged in similar conduct.").

The disciplinary action taken against the former, non-class member police officer is certainly relevant to establishing a *prima facie* wrongful discharge case. However, this single comparator fails to demonstrate that Sgt. Roxby's misconduct was "nearly identical" to that of Mull. For instance, Sgt. Roxby's use of the background check computer system, which was used for purposes unrelated to work, did not deprive Wheeling of resources or labor. Though Plaintiffs argue that Mull's misconduct was harmless, Mull effectively acquired three unearned days of excused leave from Wheeling by submitting the forged note. There is no evidence in the record that Sgt. Roxby, likewise, incurred additional excused leave after submitting the falsified form or that his misconduct otherwise interfered with his work obligations.

Plaintiffs' failure to come forward with any additional cases of unequal or disparate treatment demonstrates the weakness of their claim. *See Houck v. Polytechnic Inst. & State Univ.*, 10 F.3d 204, 206–07 (4th Cir. 1993) (noting that in the context of Title VII, "isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees."). Without evidence that Mull's protected activity was the motivating factor for his termination, Plaintiffs fail to establish a *prima facie* discrimination case. Even if Plaintiffs could establish a *prima facie* case, it is undisputed that Mull submitted a forged doctor's excuse to obtain excused leave, a clear

34

nondiscriminatory cause for his termination. Plaintiffs have failed to rebut this evidence by showing that Wheeling identified Mull's forgery as a pretext for workers' compensation discrimination. *See Adams v. Greenbrier Minerals, LLC*, No. 2:17-cv-03127, 2018 WL 5928057, at *3 (S.D. W. Va. Nov. 13, 2018) (defining "pretext" as "an ostensible reason or motive assigned as a color or cover for the real reason or motive" (quotation marks and citations omitted)). Accordingly, summary judgment is warranted and **GRANTED** to Wheeling on Count XI.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. (ECF No. 68.) Summary judgment is **GRANTED** to Defendants on Counts I, II, III, IV, V, VI, VII, IX, X, and XI with respect to Wheeling and Counts II, III, VII, IX, X, and XI with respect to Griffith. Summary judgment is **DENIED** as to Count VIII with respect to Wheeling and Counts I, IV, V, VI, and VIII with respect to Griffith and, thus, these claims will remain for trial.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      October 18, 2019

THOMAS E. JOHNSTON, CHIEF JUDGE